UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Susan Kastning,

    Plaintiff,

v.                                  No. 17 CV 50068
                                        Magistrate Judge Iain D. Johnston

Nancy A. Berryhill, Acting
Commissioner of Social Security,[1]

    Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff filed her disability application in 2013, alleging that she could no longer work full-time, starting in 2001, because of mental problems stemming from traumatic brain injury suffered in a 1989 car accident when she was 17 years old. Because plaintiff only filed a Title II application, she had to show that she was disabled no later than her date last insured of December 31, 2006. The administrative law judge ("ALJ") found plaintiff not disabled. The ALJ's decision rested heavily on the absence of any contemporaneous evidence about plaintiff's condition in 2001-06. Plaintiff argues that the ALJ unduly narrowed the evidentiary record to this five-year window, ignoring significant medical evidence before and after then. Plaintiff also criticizes the ALJ for not calling a medical expert and not ordering cognitive tests to develop the record.

## BACKGROUND

In the 1989 car accident, plaintiff fractured her spine, left foot, and right ankle, and also suffered a severe closed head injury with intracranial bleeding. She stayed in the hospital and then an in-patient rehab facility for over four months. She was initially comatose and later had

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

three periods of unresponsiveness that were initially thought to be seizures, although the EEG was negative. During this stay, plaintiff was given an IQ test and received a score of 73, which indicated borderline intelligence and which was considered to be a significant drop-off for a former honor roll math student. Plaintiff's mother described her as being suddenly like a 10-year-old. Doctors recommended that she be placed in special education classes when she returned to high school.

Eventually, after this long stay in rehabilitation and after several more years, plaintiff was able to work in variety of jobs from 1992 to 2001. But then she stopped working in 2001. The reasons are not entirely clear. At the later administrative hearing, plaintiff testified that she stopped working only because of the physical problem of standing as a cashier. Her counsel argues here that the real problem, though not fully understood by plaintiff, was emotional and cognitive problems lingering from the 1989 accident. In the years after she stopped working, plaintiff got married and stayed at home raising two children. The record unfortunately contains little concrete information about plaintiff's condition during this time because plaintiff neither sought, nor received, any medical treatment, other than routine care for the two childbirths. Then, in 2013, plaintiff had what appears to be a sudden downturn psychologically. She was hospitalized four times in a year, attempted suicide, had a psychotic episode, and was diagnosed with bipolar disorder.

The ALJ found plaintiff not disabled based on two fundamental facts. The first was the large treatment gap between the accident and the 2013 breakdowns. The second was that plaintiff worked from 1992 to 2001 and then got married and had two children. According to the ALJ, these two facts showed that plaintiff was not suffering from any after effects from the 1989 accident. For this reason, the ALJ largely ignored the evidence from the 1989 accident and four-

month rehabilitation. The ALJ also excluded from the analysis all the treatment records from the 2013 breakdowns because they occurred "well after" December 31, 2006. However, the ALJ acknowledged that plaintiff's mental problems in 2013 were serious enough that they might show she was disabled *at that time*, but that this fact had no bearing on whether she was disabled in 2006. Consequently, the ALJ's decision contains little substantive discussion of any objective medical evidence. The ALJ's only source of information about plaintiff's condition during the relevant period was the testimony at the 2015 administrative hearing from plaintiff and her mother. The ALJ concluded that plaintiff undermined her case by making the following two admissions: (i) she did not seek treatment because "she did not feel there was anything wrong with her"; and (ii) she quit working voluntarily in 2001 because "she could not tolerate standing." R. 17. As for plaintiff's mother, who testified that plaintiff was having emotional problems in 2001-06, the ALJ stated that any such problems were addressed by limiting plaintiff to routine and simple jobs.

## DISCUSSION

Plaintiff raises three arguments. She argues that the ALJ failed to consider the longitudinal record; failed to call an impartial medical expert; and failed to order cognitive testing to determine if the 1989 IQ score were still accurate. The gist of these arguments is that, although there may not have been objective contemporaneous evidence about plaintiff's condition in 2001-06, a medical expert could have listened to plaintiff's testimony and asked her questions at the hearing and could have analyzed the medical records from 1989 and 2013 and could have considered new cognitive tests and then could have used all this information to extrapolate what plaintiff's condition was in 2001-06.

3

This argument faces several obstacles. As the Government repeatedly emphasizes in its brief, there was a significant treatment gap. Twenty-three years without any treatment is a large informational vacuum. Any finding that plaintiff was disabled would require an expert to stretch inferences at least seven years back in time or, alternatively, twelve years forward in time.

Another problem is that plaintiff has not, in her two briefs, articulated a clear and coherent theory to explain the various evidentiary strands and counter-arguments relied on by the ALJ. Plaintiff's opening brief contains only two and a half pages of substantive analysis, and it is thin on discussion of specific evidence. Plaintiff focuses heavily on the one IQ test in 1989, but this evidence by itself is not especially strong because it is not linked up to other findings, nor grounded in a consistent medical theory or diagnosis. The IQ score presumably speaks to plaintiff's cognitive problems, but plaintiff's later bipolar diagnosis seems to indicate that emotional problems were the central issue. (It is not clear how the ongoing memory problems fit in with these two problems.) Also, the ALJ addressed the low IQ score by noting that plaintiff's doctors indicated that this test was given when plaintiff was "coming out of her post-traumatic amnesia and significant improvement was expected" thereafter. R. 17. Plaintiff also argues that she was only able to work because of assistance from the Pioneer Center. Although the ALJ did not directly address this issue, the ALJ noted that plaintiff worked as a cashier at Walmart "without accommodation," thus suggesting that plaintiff was not receiving day-to-day assistance from the Pioneer Center after she obtained this particular job. *Id.* More generally, plaintiff has not discussed any of the particular findings or diagnoses from the 2013 treatment records, and she has not submitted any opinion from a current treating physician who could, in theory, address the issue of whether plaintiff's bipolar disorder started well before the 2013 breakdowns.

In sum, based on the record as considered by the ALJ, the Court agrees that there was not enough information to find plaintiff disabled in 2001-06. The relevant question, however, is whether the ALJ should have made an attempt to develop the record further and whether such an effort could realistically uncover sufficient information to show that plaintiff was disabled.[2] Although the ALJ did not provide an explanation for why she chose not to call an expert or order more testing, she seemed to believe that plaintiff's condition in 2001-06 was lost in the mists of time and could not be archeologically recovered by any medical expert.

Despite these valid concerns and arguments, the Court still concludes that a remand is warranted for several reasons. First, the ALJ's reasoning was not supported by any medical opinion. The ALJ did not call an impartial medical expert, and the ALJ gave no weight to the opinions of the State agency physicians. Therefore, the ALJ was relying on her layperson assumptions about the nature of plaintiff's brain injury and other mental problems and about their likely prognosis over plaintiff's lifespan. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (the ALJ should "rely on expert opinions instead of determining the significance of particular medical findings themselves"); *see also Lambert v. Berryhill*, No. 17-1627 at p. 8 (7th Cir. June 19, 2018) ("ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves.").

Second, although far removed from the relevant time period, the medical evidence from 1989 and 2013 nonetheless showed that plaintiff had significant problems. By all accounts, plaintiff's traumatic brain injury in 1989 was severe. A four-month stay would have required

---

[2] An ALJ has a duty to develop a full and fair record. *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). However, courts generally defer to the ALJ's reasoned judgment as to when further inquiry is warranted. *Id.*; *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled."); *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir.1994) ("Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand.").

5

extensive treatment and analysis by multiple doctors and nurses, but little of this evidence was considered. Given the severity of the injury and the length of treatment, it is reasonable to ask whether this injury could have caused permanent and life-long problems and, more particularly, whether it could have caused problems that would remain latent and only emerge years later. The 2013 evidence indicates that plaintiff, in fact, did have serious problems later, as indicated by the multiple hospitalizations and a suicide attempt, among other things. In the decision, the ALJ acknowledged that plaintiff's GAF scores in 2013 indicated "quite severe" limitations that were consistent with "significant mental impairments." R. 14, 15. The severity of these problems raises a question as to whether they emerged suddenly, like the flip of a light switch, or whether they had been slowly building for years. A related question is whether there were two separate and independent problems consisting of the traumatic brain injury and then the later-diagnosed bipolar disorder or whether it all stemmed from the original 1989 injury? These are questions that a medical expert could potentially answer; alternatively, the medical expert could validate the ALJ's implicit finding that no firm conclusions can be drawn given the lack of contemporaneous treatment records.

Third, the ALJ seems to have operated on the assumption that a doctor cannot make a diagnosis of a claimant's condition at some earlier time by relying on inferences drawn from evidence of the claimant's current condition. But SSR 83-20 specifically endorses this type of diagnosis, as explained in the following passage:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating

6

> that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.
>
> If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation. Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition.

The ALJ apparently believed that the time gap in this case was so insurmountable (the ALJ noted that it was "well" after the date last insured) that it was not possible for any expert to offer a retrospective diagnosis. Perhaps the ALJ was correct, but her layperson opinion is insufficient; he needed a medical expert.

Fourth, a pivotal piece of evidence relied on by the ALJ was plaintiff's alleged admissions that she did not have any need for mental health treatment in 2001-06 and that she did not quit working because of any mental problems. But the ALJ never considered the possibility that plaintiff's problems may have prevented her from accurately assessing her own condition and from seeking treatment. Plaintiff was diagnosed with bipolar disorder in 2013. The Seventh Circuit has repeatedly noted that bipolar claimants often have difficulties in seeking and adhering to treatment.[3] Plaintiff also had a traumatic brain injury that may have affected her ability to diagnose herself and realize that that she needed to seek treatment. This issue was recently discussed by the Seventh Circuit. In *Kaminski v. Berryhill*, __ F.3d ___, 2018 WL 3341811 (7th Cir. July 9, 2018), the claimant suffered a traumatic brain injury in 2000 and then applied for disability benefits 13 years later. The ALJ rejected an opinion from the claimant's treating physician because plaintiff had made statements that "he did *not* have memory loss,

---

[3] *See, e.g., Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) (noting that bipolar disorder "may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment"); *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) ("ALJs assessing claimants with bipolar disorder *must* consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference.") (emphasis added).

7

problems with concentration, or mood and personality changes." *Id.* at *3 (emphasis added). The Seventh Circuit found fault with the ALJ's reasoning, noting that a "paradoxical effect" of a frontal-lobe injury was that it made a person "unable to understand the magnitude of his impairments." *Id.* Therefore, the claimant's statements were not reliable evidence that he was functioning well, but instead the corroborated the doctor's opinion "that Kaminski was significantly limited *yet did not recognize his limitations.*" *Id.* (emphasis in original); *see also id.* ("His denials of impairments and limits were in fact some of the symptoms of the serious brain injury that he suffered"). A similar analysis could *potentially* apply here, although this is an issue that an expert would have to address specifically.[4]

One additional issue should be noted. Plaintiff's case, as presented below, relied heavily on her mother's testimony. Although the ALJ briefly acknowledged this testimony, the ALJ summarized it in a general way, stating that plaintiff's mother testified that plaintiff had "difficulty with social and family relationships," "trouble with her memory," "some anger issues," and an obsession "with talking about the [1989] accident." R. 18. Although this summary is not inaccurate, it omitted some of the specific details, which arguably paint a more dysfunctional picture. Specifically, the mother testified that, in 2006, plaintiff was a hoarder with an unclean house and with "dirty clothes everywhere"; that she spent hours with her kids just walking around Walmart; that she would get confused while talking to people and would misinterpret things and "shut down" and "sit and just look way"; that she forgot everything; and that she would blow up after receiving criticism or feedback. R. 65-69. She testified that plaintiff's jobs ended because of these problems. The ALJ purportedly accepted this testimony as being true, but then found that all these problems could be accommodated by limiting plaintiff to

---

[4] It should be noted that the plaintiff in *Kaminsky*, unlike plaintiff here, had obtained an opinion from a treating physician.

"unskilled, low stress work with limited contact with public and supervisors." R. 18. But the ALJ did not rely on any medical testimony in reaching this conclusion, and offered no analysis for why she believed that these RFC limitations would truly account for all the above problems. More analysis is needed given the severity of the problems testified to by plaintiff's mother. This is another area where expert could help by, for example, synthesizing the mother's recollections within a broader medical framework.

To sum up, after reading the briefs and the ALJ's decision, the Court remains unclear about the basic nature of plaintiff's medical diagnoses and specifically about whether the earlier brain injury was connected to the later bipolar diagnosis. The ALJ's decision skips over the medical evidence and relies on plaintiff's lack of treatment and her work history. These inferences are not necessarily improper but they are incomplete and disembodied from the medical record. Although this is a close case, this Court concludes that a remand is warranted so that a medical expert can provide a more complete analysis based a review of the longitudinal record.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date:  July 23, 2018  By:  _____
 Iain D. Johnston
 United States Magistrate Judge